**Affidavit In Support of Criminal Complaints and Arrest Warrants**

1. I, Monte Shaide, am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and am currently assigned to the Missoula Resident Agency in Missoula, Montana. I have been employed as an SA for over 18 years and in that time have had extensive training and experience in conducting violent-crime related investigations, including robberies, carjacking(s), and kidnappings. I am a member of the FBI Montana Regional Violent Crime Task Force (MRVCTF), which specializes in targeting habitual violent offenders, dismantling violent criminal enterprises, and tracking fugitives. For over nine years, I served on the Pierce County Violent Crime Task Force in Tacoma, Washington, and the Puget Sound Task Force in Seattle, Washington. During that time period, I specialized in bank robbery, fugitive, and other violent criminal matters. I have been the Affiant on numerous complaints charging individuals who have violated criminal law. I am assigned to the following investigation, and the information contained in this affidavit is based on my own observation, training, experience and, where noted, information provided to me by other law enforcement officers.

2. On May 27, 2016, at approximately 3:00 a.m., the Missoula County Sheriff's Office (MCSO) 911 Dispatch was advised of a robbery that took place at the

Deano's General Store located at 5318 West Harrier Street, Missoula, Montana. According to witness statements taken by MSCO Detectives, two males, hereinafter referred to as Robber 1 and Robber 2, entered Deano's General Store at approximately 3:00 a.m. Both robbers brandished handguns, and one of the robbers immediately started knocking down the video surveillance cameras with a broom stick. Robber 2 ordered the employees and a customer, at gunpoint, to the rear area of the store while Robber 1 instructed one of the employees to give him all the cash in the drawers and the safe. The employee complied with the robbers' demands and provided the robber with cash from the safe and drawers. All of the victims in the store provided similar descriptions of the robbers. Robber 1 was described as a black male, approximately 5'6" to 5'8" in height, thin build, wearing a black hat, sunglasses, black bandana, black hoodie, black pants, black shoes, and black gloves. Robber 1 brandished a silver revolver and had a second semi-automatic handgun visible in his front waistband. Robber 2 was described as being a white or Hispanic male, slightly shorter, 5'5" to 5'7", average build, wearing a black hat, a black bandana, a black shirt, black pants, black shoes, and black gloves. Robber 2 brandished a black semi-automatic handgun. An audit conducted by the General Manager subsequent to the robbery indicated a loss of approximately $3,200.

3. During the robbery, a male customer, who was picking up an employee walked into the store and was immediately confronted by one of the robbers. The male was ordered at gunpoint to surrender his keys to the robber. Shortly after, another customer, who will be referred to as "RJ," entered the store to buy a candy bar and a soda. Robber 1 pointed a handgun, described as a silver revolver by RJ, in RJ's face and ordered RJ over to the counter. While at the counter, Robber 2 approached RJ and pointed a semi-automatic handgun directly at RJ and asked him what he was doing in the store. Robber 2 was very agitated and was telling all the victims in the store to "listen or shit's going down." Robber 2 stated to the victims in the store, "this is what happens when you don't listen." Robber 2 then walked directly over to RJ, and stated, "I am going to take this guy into the back room and shoot him." Robber 2 did not shoot the weapon.

4. Approximately two minutes later, RJ's son, TJ, walked into the store to use the restroom. Robber 2 pulled RJ back as RJ told Robber 2 that TJ was his son. Robber 2 ordered RJ to grab a soda and leave with his son. RJ and TJ, who is 12 years of age, exited the store and got into their vehicle, a 2010 Chevy Traverse, with RJ's wife, BJ, RJ's mother in law, KR, and RJ's daughter EJ, who is 14 years of age. BJ was driving the vehicle and on the phone with MCSO dispatch reporting the robbery. BJ exited the parking lot and pulled up

to the eastbound on ramp to I-90 within a close proximity from the store. RJ was now on the phone with 911 Dispatch, when both robbers opened the driver and passenger side doors. The robbers pointed their weapons at the family and entered the vehicle. One of the robbers stated, "Hey I let you go. What the hell are you doing? You told me you weren't going to tell anybody!" At around the time the robbers entered the vehicle, BJ observed a dark sedan speed away from the area of the on/off ramp.

5. Robber 2 got into the rear driver's side seat and Robber 1 got into the front passenger side seat. Next to Robber 2 was EJ and next to Robber 1 was RJ. RJ was sitting on the console as BJ was ordered to drive.

6. BJ was instructed to drive eastbound on I-90 and exit at Orange Street. They continued down numerous Missoula city streets as Robber 2 instructed RJ to call 911 Dispatch. Robber 2 was also ordering BJ to run stop lights and drive at a high rate of speed. According to the victims, Robber 2 was acting very agitated and jittery and appeared to be on drugs. When RJ heard the sirens, Robber 2 told RJ to tell dispatch to have the cops back off. Robber 2 was talking in "gangster slang" and using expletives. Robber 1 made at least two phone calls during the pursuit.

7. During the pursuit, MCSO Deputy Birket was monitoring the 911 Dispatch and kept pleading with the robbers to let the children go. Deputy Birket told

the robbers via RJ that the police would back off if they released the children. Robber 2 ordered BJ to stop the car. The robbers let EJ out near the intersection of Reserve Street and Palmer. EJ was released and Robber 2 told RJ to tell the police to stay back. Deputy Birket assured RJ that the police would stay back if the robbers let the other child go. Robber 2 began yelling that he was going to kill the remaining child hostage if the police did not back off. After further negotiations, and once the police were back far enough, Robber 2 ordered BJ to stop the vehicle. TJ, along with his grandmother, KR, were released. Robber 2 told TJ to kiss and hug his parents goodbye. Shortly after releasing TJ and KR, Robber 2 ordered BJ to stop the vehicle. Robber 2 moved to the driver's seat from inside the vehicle pushing BJ out of the seat.

8. Deputy Birket was still on the phone with RJ determining through yes/no questions where the robbers were currently seated in the vehicle. Robber 2 was driving and Robber 1 was in the rear driver's side seat. Both windows on the driver's side of the vehicle were rolled down. The robbers continued to state to Deputy Birket that they would kill the hostages if the cops didn't back off.

9. In the area of south Brooks Street, Robber 2 leaned out the window and fired a shot out of the front driver's side window at MCSO Sergeant Ryan Prather. Robber 2 abruptly turned the vehicle and stated, "I'm not fucking around!"

At least one other shot was fired from inside the vehicle by Robber 2. RJ recalled glass shattering when Robber 2 fired his handgun.

10. Robber 1 had two guns on his person, a silver revolver and a black handgun. Robber 1 did not point the guns or fire the guns at the police during the pursuit.

11. After firing at the police, Robber 2 continued at a high rate of speed to I-90. Police units stayed back as the vehicle continued on I-90 and then northbound on Highway 93. The robbers turned off at Sweet Grass Lane, just off of Highway 93. They drove down the road, stopped the vehicle, and turned off their lights. They wanted to get out but realized it would activate the interior lights. Both robbers started making phone calls from their cell phones. Robber 2 made a call and stated, "We are on the hill. Remember where I told you to go the first time? Well I want you to go to the other place."

12. RJ and BJ are pleading with the robbers to let them go. Finally, both robbers crawled out of the windows of the vehicle. The robbers threw the keys on the hood of the vehicle and told RJ and BJ to wait 20 minutes and then leave. The robbers walked into the darkness. RJ and BJ waited for a few minutes and then returned to Missoula. Once in Missoula, RJ and BJ met with MCSO Detectives and provided statements. Their vehicle was searched for evidence. A bullet was recovered from inside the vehicle's dash panel.

13. MCSO Deputies, the MCSO SWAT team along with the assistance of the Missoula Police Department's SWAT team conducted a manhunt in the area of Sweet Grass Lane and Highway 93. All efforts and leads to locate the robbers were unsuccessful.

14. In an effort to identify the robbers, MCSO Detective Jared Cochran who is a Task Force Officer (TFO) assigned to the MRVCTF, contacted FBI Special Agent Erich Fellenz who is a Technically Trained Agent (TTA) and an expert in wireless intercept and tracking technology. MCSO requested an exigent cell tower dump of all towers servicing the areas of the robbery, carjacking, pursuit, and drop off location. TFO Jared Cochran provided SA Fellenz with cell tower information from all towers within the city and the area of the robbery to conduct a tactical analysis of the cell phone calls during that time period.

15. SA Fellenz provided a short list of numbers to TFO Cochran. TFO Cochran queried MCSO's data base and contacted Adult Probation and Parole for any individuals who may have been associated with, or subscribed to, cell numbers (406) 207-2764 and (406) 274-3020. It was determined Thomas Earl Dempsey, a registered violent offender who is currently on probation, was listed as the user for cell phone number (406) 207-2764 in the MCSO data base. It was determined Mariah Dempsey, Thomas' wife, was listed as the

user for cell phone number (406) 274-3020 in Adult Probation and Parole's data base.

16. Thomas Dempsey is a white male, approximately 5'7" in height with an average build, matching the identity of Robber 2. Dempsey has a violent criminal history and is currently on probation. TFO Cochran determined through social media websites that Dempsey and a black male named Nick West were associates. West is a black male, 5'9" in height with a thin build. West is also a violent offender who is currently on parole. West was developed as the possibility of being Robber 1.

17. In the late afternoon of May 27, myself, along with other MCSO Detectives, and MRVCTF personnel set up surveillance in the area of Dempsey's residence in Missoula. Dempsey left his residence in his vehicle with a white female and drove to the Motel 6 on North Reserve in Missoula. Dempsey and the female went into the motel for a short period of time and then drove to Taco Time. They went through the drive through and then returned to the motel. Dempsey then left the motel and drove to the Deano's Casino, located at 5055 N. Reserve in Missoula.

18. Law enforcement units set up surveillance in and around the casino. MCSO Detectives, MRVCTF personnel, and I entered the casino and arrested Dempsey without incident. Dempsey was advised he was being arrested for

the robbery and kidnapping that occurred earlier in the morning. Dempsey appeared to be high on methamphetamine. Dempsey did not make a statement.

19. Detectives and Agents returned to the Motel 6 and identified the female who was with Dempsey at the Motel 6 as Hannah Parker. When Parker was initially contacted and interviewed, she denied knowing anything about the robbery.

20. TFO Cochran and I contacted Mariah Dempsey at her place of employment. Dempsey agreed to be interviewed. Mariah was escorted to the FBI Resident Agency in Missoula and provided the following statement:

21. Mariah stated she was contacted by Dempsey earlier in the morning, at approximately 4:00 a.m., as Dempsey told her things went bad and she needed to come and pick him and Nick up. Mariah stated her cell phone number was (406) 274-3020. Mariah was shown a photo and identified Nick West as the person she knows as "Nick". Dempsey hung up and then called Mariah back telling her to go to the area of Sweet Grass Lane on Highway 93 near Evaro. Mariah drove to the area of Sweet Grass Lane and Dempsey and West got into her vehicle. They were wearing all black. Dempsey told her they robbed a store and their driver "fucked up" so they had to take a family hostage and

threaten them. Mariah stated she didn't see any guns but knew guns were involved as Dempsey told her he shot at the cops to get rid of them.

22. During the interview, MCSO and MPD Detectives had located Nick West at his place of employment. West was arrested without incident. West was interviewed but would not admit to his involvement in the robbery. MCSO Detectives also contacted Carissa Lynn Kopp, West's girlfriend, at West's residence in Missoula. Kopp was interviewed and denied any involvement or knowledge of the robbery.

23. On May 28, Hannah Parker re-contacted FBI SA Schrader regarding her phone, which was seized by the MCSO. Parker stated she wanted to come in and talk. Parker was escorted to the FBI Resident Agency by SA Schrader and I. Parker provided the following statement:

24. Parker stated she met Dempsey approximately a week ago through her boyfriend. Parker had traveled to Missoula from Thompson Falls and had no money and no place to live. Parker denied using methamphetamine but stated she would middle-man methamphetamine deals for Dempsey as he promised her money. Prior to the robbery in the early morning hours of May 27, Dempsey, a person Parker identified as Nick West, and a female Parker identified as Carissa Lynn Kopp who went by the moniker of "Homegirl," picked Parker up near the Poverello Center in Missoula. Kopp is the girlfriend

of West and was driving her vehicle, identified as a black sedan, by Parker. Parker got into the backseat of the vehicle. In the back seat next to Dempsey was an AK47 assault rifle under a white pillow case. Both West and Dempsey were dressed in black. Dempsey was armed with a handgun and Parker assumed West was armed with a handgun as well. Parker stated they drove around Missoula for a little while and then Kopp drove to the Airway Boulevard exit. SA Schrader and I escorted Parker to the Airway Boulevard exit and she pointed out the location just off the westbound off ramp to the north and east of Deano's convenience store where Kopp dropped off West and Dempsey. West and Demspey walked towards the convenience store. According to Parker, Kopp waited and then left as they were worried when West and Dempsey had not returned from the store. A short time later, Dempsey had cell phone contact with Kopp and asked her and Parker to meet them as Dempsey needed the AK47 to shoot the police. Parker stated she was scared for her life as Dempsey had threatened her with a handgun on a previous occasion and admitted to her he had been robbing casinos.

25. MCSO Lieutenant Jon Gunter re-contacted Kopp. Kopp voluntarily drove down to the MCSO to meet with investigators. TFO Guy Baker and I escorted Kopp to the FBI Resident Agency to be interviewed. Kopp was advised of her Miranda Rights, waived her rights and provided the following information:

26. Kopp stated she met West a month ago and they have been dating ever since. Kopp admitted to being the driver during the robbery. Kopp also admitted to being present during the planning of the robbery by West and Kopp. Kopp was present when West took two handguns and an assault rifle which were stored in his residence and placed them on his person and in the vehicle. Kopp stated a white pillowcase covered the assault rifle. Kopp, West, and Dempsey drove in her 2009 Chevy Impala, black in color, which matched the description provided by one of the hostages as the vehicle that sped off near the underpass of I-90, to pick up Dempsey's girlfriend (Parker) near downtown Missoula. After picking up Dempsey's girlfriend, they drove around Missoula for a bit and then drove west on I-90 towards the Airway Boulevard exit. Both West and Dempsey were dressed in black and had handguns. Kopp stated she became nervous and decided she didn't want to go through with it and left the area. TFO Baker and I drove Kopp to the area of I-90 and Airway Boulevard. Kopp pointed out the exact location where they had dropped off West and Dempsey near Deano's Store.

27. I conducted a criminal history check in NCIC for Dempsey, West, and Kopp. According to NCIC, Dempsey is a registered violent offender and has prior felony convictions for Robbery, Attempted Burglary, Theft, and Accountability for Burglary. West is a registered violent offender and has

prior felony convictions for Assault with a Weapon, Assault on a Peace Officer, Tampering with a Witness, and Partner/Member Family Assault. Kopp has prior felony convictions for Criminal Possession of Dangerous Drugs and Forgery.

28. Based on the foregoing, Affiant submits that there is probable cause to believe Thomas Earl Dempsey knowingly and unlawfully committed the crimes of Robbery Affecting Commerce, a violation of Title 18 U.S.C. sections 1951 and section 2; Carjacking, a violation of Title 18 U.S.C. sections 2119 and 2; Possession of a Firearm During and in the Relation to a Crime of Violence, a violation of Title 18 U.S.C. section 924(c)(1)(A)(ii); Discharge of a Firearm During and in the Relation to a Crime of Violence, a violation of Title 18 U.S.C. section 924(c)(1)(A)(iii); and Felon In Possession of a Firearm, a violation of Title 18 U.S.C. section 922(g), on or about May 27, 2016. Affiant submits there is probable cause to believe Nick West knowingly and unlawfully committed the crimes of Robbery Affecting Commerce, a violation of Title 18 U.S.C. sections 1951 and section 2; Carjacking, a violation of Title 18 U.S.C. sections 2119 and 2; Possession of a Firearm During and in the Relation to a Crime of Violence, a violation of Title 18 U.S.C. sections 924(c)(1)(A)(ii) and 2; Discharge of a Firearm During and in the Relation to a Crime of Violence, a violation of Title 18

U.S.C. sections 924(c)(1)(A)(iii) and 2; and Felon In Possession of a Firearm, a violation of Title 18 U.S.C. section 922(g), on or about May 27, 2016. Affiant also submits there is probable cause to believe Carissa Lynn Kopp knowingly and unlawfully committed the crimes of Robbery Affecting Commerce, a violation of Title 18 U.S.C. sections 1951 and section 2; Carjacking, a violation of Title 18 U.S.C. sections 2119 and 2; Possession of a Firearm During and in the Relation to a Crime of Violence, a violation of Title 18 U.S.C. sections 924(c)(1)(A)(ii) and 2; and Discharge of a Firearm During and in the Relation to a Crime of Violence, a violation of Title 18 U.S.C. sections 924(c)(1)(A)(iii) and 2 on or about May 27, 2016.

Monte Shaide, Special Agent
Federal Bureau of Investigation

SUBCRIBED TO AND SWORN BEFORE ME this 31st day of May, 2016.

Hon. Jeremiah C. Lynch
United States Magistrate Judge
Missoula, Montana